IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>DANIEL ALFONSO BLANCO, et al.,<br><br>Defendants. | MEMORANDUM DECISION AND<br>ORDER SETTING LOSS AMOUNT<br><br><br><br>Case No. 2:10-CR-1030 TS |

This matter is before the Court to determine the appropriate loss amount in preparation for sentencing of Defendants Daniel Alfonso Blanco, Mauricio R. Munoz, and Michael Russell Held (collectively referred to hereinafter as "Defendants"). Having reviewed the submissions of the parties and the evidence presented, the Court is now prepared to rule.

I. BACKGROUND

This case arises from a scheme to use falsely inflated real estate values to defraud prospective short-term real estate investors. Each of the Defendants aided to some degree in carrying out the scheme. Defendant Munoz and an unindicted co-conspirator were the principal organizers of the scheme. Together, they convinced two investors to provide $4,414,389 as bridge loans on five real estate lots in the Promontory Point subdivision of Park City, Utah.

1

In order to persuade the prospective investors to provide a bridge loan in excess of the value of the lots, Defendant Munoz took the purchase agreements to Defendant Held and instructed Defendant Held to alter the purchase agreements to reflect a purchase price double the price actually paid for the lots. Defendant Munoz then facilitated closing the bridge loans through Defendant Blanco, who prepared false HUD-1 statements to support the inflated purchase prices. The actions of the Defendants induced the investors, now victims, to loan twice the actual value of the properties.

Defendants' fraudulent scheme was subsequently exposed and the victims have taken action to recover the amount loaned. The victims put the Promontory Point lots up for sale and have succeeded in selling two of the lots for $230,000 each. The evidence provided by the victims demonstrates that after paying taxes, homeowner's association fees, community enhancement fees, and settlement charges, the cumulative net value received on these two lots was $394,978.54.

The remaining three lots have not been sold and are currently listed for $295,000, $359,000, and $375,000. The Government has provided evidence that the tax-assessed value of these lots for 2011 was $192,640, $200,140, and $202,120. The tax assessed value for the same lots in 2012 is $232,640, $230,140, and $232,120. Defendants have provided appraisals for the same lots showing the current market value to be $430,333, $491,000, and $563,000.

The victims also pursued recovery from the title company involved in this transaction and recovered $200,000 in that suit. According to the Victim Impact Statement submitted to the Court, the victims have spent $92,211.02 in attorneys' fees as a result of Defendants' fraudulent

scheme. It is unclear however what percentage of these fees were spent in pursuing recovery from the title company.

## II. DISCUSSION

U.S.S.G. § 2B1.1 "increases a defendant's base offense level for fraud according to the amount of the loss."[1] In determining the proper loss amount "the court is instructed to use the greater of actual or intended loss."[2] "'Actual loss' means the reasonably foreseeable pecuniary harm that resulted from the offense."[3] The Tenth Circuit has made clear that "the sentencing court need only make a reasonable estimate of the loss."[4]

The general rule "[i]n a case involving collateral pledged or otherwise provided by the defendant" is that the loss amount is reduced by "the amount the victim has recovered at the time of sentencing from disposition of the collateral, or if the collateral has not been disposed of by that time, the fair market value of the collateral at the time of sentencing."[5] Notwithstanding this general rule, the Guidelines provide more specific instruction as follows:

> in the case of a fraud involving a mortgage loan, if the collateral has not been disposed of by the time of sentencing, use the fair market value of the collateral as of the date on which the guilt of the defendant has been established, whether by guilty plea, trial, or plea of nolo contendere.

---

[1] *United States v. Snow*, 663 F.3d 1156, 1160 (10th Cir. 2011) (internal quotation marks and citation omitted).

[2] *Id*.

[3] U.S.S.G. § 2B1.1 cmt. n.3(A)(i).

[4] *Snow*, 663 F.3d at 1160–61.

[5] U.S.S.G. § 2B1.1 cmt. n.3(E)(ii).

3

> In such a case, there shall be a rebuttable presumption that the most recent tax assessment value of the collateral is a reasonable estimate of the fair market value. In determining whether the most recent tax assessment value is a reasonable estimate of the fair market value, the court may consider, among other factors, the recency of the tax assessment and the extent to which the jurisdiction's tax assessment practices reflect factors not relevant to fair market value.[6]

As a threshold issue, the Court finds that Defendants have met their burden to rebut the presumption that the most recent tax assessments are a reasonable estimate of the fair market value of the remaining unsold Promontory Point lots. The Court will therefore determine the actual loss in this case based on the fair market value of the unsold lots as demonstrated by the remaining evidence submitted.

Here, the most reasonable approach to determine the proper credit against the total loss is to use the current listing price of the unsold lots in determining fair market value. Further, because "actual loss should be measured by the net value, not the gross value, of what was taken when the defendant pledged collateral to secure a fraudulent loan," the amount reasonably anticipated to be required to liquidate the lots should be deducted from the listing price. For the previously sold lots, the victims received a net payout of 80 percent and 90 percent of the total value of the sale. The Court will therefore postulate that the median of these percentages will be the resulting net receipt by the victims on the remaining lots.

Applying the calculation set out above, the Court finds that the total loss amount shall be reduced by the following amounts as a result of the sale, and prospective sale of the Promontory

---

[6]*Id*. at n.3(E)(iii).

Point lots: $208,942.54; $186,036; $250,750; $305,150; and $318,750. This results in a total loss reduction of $1,269,628.54.

Additionally, the victims have received $200,000 as a result of a civil suit against the title company involved in the scheme to defraud. That amount will also be deducted from the total loss calculation. The Government urges that this $200,000 should in turn be reduced by the victims' attorneys' fees, which total $92,211.02. The Court is persuaded that attorneys' fees may be included in a loss calculation.[7] However, in this case the Government has provided no support for the fee award beyond a single line in the Victim Impact Statement indicating that $92,211.02 in fees were expended. Because of the lack of detailed support, the Court is unable to determine whether such a fee award is reasonable. For this reason, the victims' attorneys' fees will not be included in the total loss amount.

### III. CONCLUSION

Based on the foregoing, the Court will reduce the total loss of $4,414,389 by $1,269,628.54 and $200,000. The resulting total loss amount is $2,944,760.46. The Court will therefore use this loss amount figure in calculating the proper offense level of the Defendants.

---

[7] *See United States v. Blackburn*, 9 F.3d 353, 358 (5th Cir. 1993) (holding that district court properly included attorneys' fees expended in separate civil suit in loss calculation).

DATED November 13, 2012.

BY THE COURT:

_____
TED STEWART
United States District Judge